**WALT–WEST ENTERPRISES, INC.,**
**Plaintiff-Appellee,**

v.

**GANNETT COMPANY, INC.,**
**Defendant-Appellant.**

Nos. 81–2939, 81–3005.

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1982.

Decided Dec. 21, 1982.

Edward M. Prince, Cushman, Darby & Cushman, Washington, D.C., for defendant-appellant.

Floyd A. Mandell, Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., for plaintiff-appellee.

Before PELL, ESCHBACH, and KASHIWA,* Circuit Judges.

ESCHBACH, Circuit Judge.

This case involves a dispute between neighbors of a sort. Plaintiff and defendant own and operate FM radio stations in the Chicago, Illinois metropolitan area. While the parties' transmitting facilities are located many miles apart, their radio stations are "located" contiguously on the FM dial. Plaintiff is licensed to broadcast at a frequency of 106.7 megahertz; defendant at 107.5 megahertz. Each party, for one reason or another, apparently finds decimal points unappealing. Thus, for the purpose of what will tentatively be called station identification, each party decided to "round" their assigned frequency to a whole number. Naturally, both chose the same number—107—and this litigation ensued. Plaintiff rounded to 107 first and argues that it acquired the exclusive right to its use. The district court agreed and enjoined defendant from using 107 in connection with its radio broadcasts. Defendant appeals. We reverse.

## I

Plaintiff-appellee, Walt-West Enterprises, Inc., owns and operates FM radio station WYEN which broadcasts in the Chicago area at a frequency of 106.7 megahertz. Beginning in 1971, when it was first licensed by the Federal Communications Commission (FCC), WYEN used the number 107, in conjunction with the acronym FM and its call letters, in its attempts to promote the station through various media (billboards, flyers, television commercials) and used 107 or FM 107 in its broadcasts. Some individuals in the broadcast profession refer to WYEN as FM 107. WYEN broadcasts primarily music, though its programming also consists of news and sporting events. The genre of music it broadcasts is "soft-rock" or "contemporary top 40."

Defendant-appellant, Gannett Company, Inc., owns and operates FM radio station WGCI which broadcasts in the Chicago area at a frequency of 107.5 megahertz. WGCI was licensed by the FCC several years after WYEN commenced operations. Until 1979, whenever WGCI used a number to identify its station, it used its precise frequency: 107.5 or 107½. In 1979, however, it began using the slogan Studio 107. After WYEN informally objected to WGCI's use of Studio 107, WGCI stopped using it, though the reason it did so is unclear. In the summer of 1981, WGCI commenced the practice of identifying itself in its broadcasts as FM 107 five times per day; it did not, however, use FM 107 in its advertisements in other

* The Honorable Shiro Kashiwa, sitting by designation. At the date of oral argument he was an Associate Judge of the United States Court of Claims. At the date of decision, by operation of Pub.L. No. 97–164, Act of April 2, 1982, he was a Circuit Judge of the United States Court of Appeals for the Federal Circuit.

media. WGCI broadcasts primarily music, though its programming also consists of news and sporting events. The genre of WGCI's music is "black contemporary." Further, WGCI characterizes itself as a "black oriented" station—one of four such stations (AM and FM) in Chicago, it says—and maintains that its news and public affairs programming, in addition to its music, are "geared towards the black community."

In the FM radio broadcasting industry it is customary for stations to round their assigned frequencies [1] to a whole number in order to alert listeners to their location on the FM dial as a mark, a term we use advisedly, of identification. Saying that they round their assigned frequency to a whole number is not entirely accurate. Stations do not feel bound by mathematics when they round to a whole number. Hence, a station with an assigned frequency might round down or up, not necessarily to the nearest whole number. Some stations prefer to round down, for in that way their whole number and their assigned frequency contain the same whole number. Other, perhaps more arithmetically minded stations, round up if their decimal point is greater than or equal to .5. Others may be attracted to a particular number. Some choices, perhaps, have no real explanation beyond the basic aversion to decimal points which the stations exhibit.

Insofar as stations call prospective listeners' attention to their frequency in advertising in order to tell the listeners where they can be found on the FM dial, it is understandable that the decimal points have been discarded. The decimal point is superfluous in this respect. A miniscule number of listeners have radios with digital receivers; virtually all FM dials merely have some of the whole numbers in the FM band printed on them. Moreover, the whole numbers appearing on the dial vary from radio to radio. Thus, one receiver may have the number 107 printed on it, while another may have 106 and 108, forcing the listener to interpolate to tune-in 107. In addition, the accuracy of the calibration between what the dial reflects and the actual frequency being received varies significantly.

WYEN and WGCI are both commercial radio stations. They derive their income from broadcasting commercial messages. A prospective advertiser's choice of a particular radio station and the amount of money which a prospective advertiser is willing to pay a given radio station to broadcast its commercials depend on a variety of factors. A primary factor, of course, is the size of its listening audience. The demographics of the audience and other factors being constant, a station with a comparatively large audience is able to attract more advertisers and charge more for the service of broadcasting its commercial messages. Because advertising revenue is the lifeblood of a commercial radio station, and because this revenue is dependent in large measure on the size of its audience, an accurate method of determining the size of each station's audience is essential.

The Arbitron Company, not a party to this litigation, is in the business of estimating the size and characteristics of radio audiences. Several times a year, in what are called ratings periods, Arbitron distributes "diaries" to a random sample of individuals in a given market. The diaries are basically time logs. The respondents are asked to carry the diary with them wherever they go and each time they listen to the radio, contemporaneously record the station to which they are listening. Respondents are instructed to use the "call letters" of the station to identify it, but if the call letters are not known, they are instructed to "fill in the name of the program—or the dial setting." Def.Exh. 1.

---

1. The portion of the radiowave spectrum between 88 million cycles per second (megahertz) and 108 megahertz has been reserved by the FCC for frequency modulation (FM) radio broadcasting. See, e.g., 47 C.F.R. § 73.201 (1981). For purposes of assigning frequencies within this spectrum to FM broadcasters, the FCC has divided it into 100 channels commencing at 88.1 megahertz and continuing at intervals of 200 thousand cycles per second (kilohertz) (.2 megahertz). · Id. Given this system, no FM radio station can be assigned a whole number frequency.

Arbitron tabulates the results of its survey and publishes a list of the stations in the given market with larger audiences. Not all stations make the list. The list is sold to advertisers and stations in the area and is used by them in various ways.

When a respondent to the survey identifies a radio station by its call letters or precise frequency, Arbitron naturally credits the station which is licensed[2] to use those call letters or that frequency. In order to be credited with a response using any other term (e.g., "the name of the program"), the radio station must have done two things in advance of the survey in question. First, it must have used that term at least once every four hours it is on the air, and second, it must have informed Arbitron of this fact. Arbitron permits stations to designate, one might say register, three such additional terms.

Arbitron will not credit a station for terms which it deems "generic," including, for example, music, gospel, easy listening, unless they are used in conjunction with a "personal identifier." Def.Exh. 8, at 1. In addition, numerical entries preceded by the *first* letter of the station's call letters are "considered generic, not personal identifiers." *Id.*

Arbitron will, however, register whole numbers used merely in conjunction with FM, e.g., FM 107. If only one station in the area has registered that term, diary entries using that term (or 107 alone it appears) will be credited to that station. In addition, Arbitron will register the same term, including whole numbers, for more than one station. In this regard, Arbitron informs radio stations that it "assumes no responsibility for the protection, possession or continued use of any slogan claimed by any station." Def.Exh. 7.

In 1981, Arbitron listed FM 107 as a slogan for WGCI for the first time, and continued to list FM 107 as a slogan for WYEN. Pursuant to its regular practice in such cases where the same term is used by more than one station, Arbitron attempted to credit the proper station with responses of 107 in two ways. First, it examined the specific diary in which the ambiguous response appeared. If that diary listed one of the stations at some other point by an unambiguous referent, e.g., its call letters, all 107 entries in that diary were credited to that station. In instances where that did not resolve the ambiguity, the respective stations were credited with ambiguous entries in proportion to the size of their respective audiences the previous year on a county-by-county basis.[3] This latter method apparently resulted in WGCI being credited with the lion's share of 107 responses in Cook County, the most populous county in the area.

When Arbitron released the results of its fall 1981 survey, WYEN was distressed to discover that it did not make the list of the top stations in the Chicago area for the first time in nine years. WYEN contacted Arbitron and discovered that WGCI was being credited with some diary responses of 107. WYEN claims that it began to receive telephone calls intended for WGCI at approximately the same time that it learned this fact from Arbitron.

## II

On November 4, 1981 plaintiff filed a six-count verified complaint against defendant in the United States District Court for the Northern District of Illinois, alleging claims under the labels of false designation of origin, service mark infringement, unfair competition, deceptive trade practices, dilution, and service mark disparagement arising under both federal and state law. Compensatory and injunctive relief were sought. Both federal question and diversity jurisdiction were alleged.

The district court granted WYEN's motion for a temporary restraining order on November 5, enjoining WGCI from using 107 for identification purposes, and sched-

---

2. The significance of the FCC licensing policies is discussed *infra* at 1058.

3. This may be an oversimplification of the statistical technique Arbitron uses, but for our purposes it will suffice.

uled a hearing on WYEN's motion for a preliminary injunction. After the two day hearing was held, the district court, in a Memorandum Opinion and Order entered November 17, granted WYEN's motion for a preliminary injunction. On November 24, WGCI filed its answer. On November 25, WYEN filed a motion to consolidate hearing on the merits with the hearing on the preliminary injunction, pursuant to Fed.R. Civ.P. 65(a). During a status conference on November 30, the district court orally denied this motion, but its docket minute order, entered the same day, granted the motion. On December 7, the district court vacated its oral order and granted WYEN's motion, entering a permanent injunction against WGCI's use of 107 in connection with its radio station. WGCI filed timely notices of appeal from the district court's orders granting the preliminary and permanent injunctions.

In light of the fact that the district court has entered a permanent injunction in this case, after the parties ostensibly consented to advancing and consolidating trial on the merits with the hearing on the preliminary injunction, we need not discuss whether the district court abused its discretion in granting interlocutory injunctive relief. Al-

though defendant makes an alternative argument that it was procedurally improper to enter the permanent injunction in this case, since we find defendant's position on the merits dispositive, we need not reach that alternative argument. Hence, we dismiss the appeal in No. 81–2939 (the appeal from the preliminary injunction) as moot, and proceed to address the merits of this controversy.

The sole[4] issue on appeal is whether defendant's use of the whole number 107 in reference to its radio station violates plaintiff's rights under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[5] The district court held that plaintiff was entitled to injunctive relief under the Lanham Act based upon its conclusions that the term 107 was plaintiff's trademark (service mark)[6] and that defendant's use of the term caused confusion.

The court rejected defendant's argument that the term was "generic," and hence, under the authority of *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978), incapable of attaining trademark protection, and instead agreed with plaintiff's position that

4. Although plaintiff's complaint sought relief under several denominated legal theories, asserting causes under both federal and state law, plaintiff's briefing below and in this court, like the district court's judgment, rests on the Lanham Act. Whatever different bases for relief plaintiff may have had under its other legal theories, if indeed any significant substantive difference exists, *see generally, James Burrough, Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274–75 n. 16 (7th Cir.1976); *International Order of Job's Daughters v. Lindeburg and Co.*, 633 F.2d 912, 916–17 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981), plaintiff has abandoned those theories in its approach to this litigation.

5. Although plaintiff's allegation of diversity jurisdiction in its verified complaint is defective, the complaint contains sufficient allegations concerning interstate commerce to confer jurisdiction under 15 U.S.C. § 1121. *See* 15 U.S.C. § 1127. *See generally, Campbell Soup Co. v. Armour & Co.*, 175 F.2d 795, 797 (3d Cir.), *cert. denied*, 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518 (1949) (discussing protection afforded unregistered marks under the Lanham Act).

6. We use the terms trademark, service mark, and trade name interchangeably in conformity with contemporary judicial parlance. We do so, however, recognizing that while it is often said that service marks and trademarks are governed by identical standards, *e.g., West & Co. v. Arica Institute, Inc.*, 557 F.2d 338, 340 n. 1 (2d Cir.1977) (per curiam), application of the standards in cases involving services as distinguished from tangible products often presents peculiar conundrums. We also note the now archaic distinction in nomenclature between trademarks and trade names, *see, e.g.*, Restatement of Torts §§ 715–16 (1938), and the current statutory distinction between trademarks and service marks, and trade names contained in 15 U.S.C. § 1127. Although trade names, as defined in § 1127, are not registrable under the Lanham Act, *Application of the Pennsylvania Fashion Factory, Inc.*, 588 F.2d 1343, 1345 (C.C. P.A.1978), an action for trade name infringement is nonetheless proper under 15 U.S.C. § 1125(a). *See, e.g., Metric & Multistandard Components Corp. v. Metric's, Inc.*, 635 F.2d 710, 714 (8th Cir.1980); *New West Corp. v. NYM Co.*, 595 F.2d 1194, 1201 (9th Cir.1979).

the term was "merely descriptive" and thus capable of becoming a trademark upon a sufficient showing of "secondary meaning." The court found that such a showing was made, based upon plaintiff's extensive advertising and promotion of the term over nearly eleven years of continuous use.

Observing that plaintiff had used the term 107 to designate its approximate position on the radio dial, the court found that the term had also acquired a source descriptive meaning. As to WGCI's use of the term, the court held there was "no evidence . . . that WGCI had any intent to palm or pass off its format-product as belonging to WYEN." Instead, "WGCI's intent . . . was to retrieve any diary questionnaires that were being credited to WYEN because of listeners' inattention to the exact frequency number of WGCI."

Concerning the issue of confusion, although the court found that "a listener would have little if no problem distinguishing the two stations by their sounds and 'beat,'" it concluded that "the identity of the two stations is susceptible to confusion due to the low degree of care likely to be exercised by listeners in distinguishing the two, especially as reflected in the Arbitron surveys." Moreover, it found actual confusion of listeners regarding the Arbitron surveys, and noted that a WYEN official had recently reported receiving telephone calls from listeners intended for WGCI.

Lastly, the court rejected WGCI's "fair use" defense. While noting that "'107' as an FM designation can describe a number of stations whose frequencies are not too far from '107,'" and that the "popular usage of the term '107' will vary from broadcast to broadcast area," the court determined that such a round number frequency designation "will normally be associated with a single radio station within [a given] broadcast area." The court concluded: "The nature of the trademark in question precludes any good faith use of it, since listeners will remain confused."

■ The district court therefore enjoined defendant from "using '107' alone or the combination '107 FM' or 'FM 107' alone in connection with defendant's radio station, WGCI." [7]

On appeal, the parties reiterate their basic arguments made below. Defendant primarily contends that the term 107, in the context of this case, is generic and incapable of becoming a trademark. Plaintiff argues that the district court properly held that the term was merely descriptive and had attained a secondary meaning.

### III

Trademark law may create as much confusion in the courts as it eliminates in the marketplace. "Its hallmarks are doctrinal confusion, conflicting results, and judicial prolixity." *HHM Publishing Co. v. Brincat,* 504 F.2d 713, 716 (9th Cir.1974). In this subtle area of the law, generalizations are especially dangerous. Nonetheless, as principles emerge from the decided cases, such generalizations are made. The *ratio decidendi* of numerous courts in uncounted cases are transformed into a verbal formula —"generalized into fiction" [8]—which itself becomes the focal point of judicial attention. We preface our analysis of the instant case with a recitation of our most recent legal fiction.

In *Miller Brewing Co. v. G. Heileman Brewing Co., supra,* 561 F.2d at 79, this court "briefly summarized" some basic principles of trademark law as follows:

A term for which trademark protection is claimed will fit somewhere in the spectrum which ranges through (1) generic or

---

**7.** Plaintiff argued below that it was entitled to a broader injunction, one that would prevent WGCI from using 107 in connection with some other term or symbol, *e.g.,* Studio 107, GCI 107. At the time it was considering the motion for a preliminary injunction, the district court was not satisfied that plaintiff had a likelihood of success on that issue, and left the question for trial on the merits. By moving for entry of the interlocutory injunction as constituting the permanent injunction, plaintiff waived any right it might have had to a broader injunction. Moreover, plaintiff does not cross-appeal from the district court's decision.

**8.** O. Holmes, Collected Legal Papers 49 (1921).

common descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful.

\*　　\*　　\*　　\*　　\*　　\*

A generic or common descriptive term is one which is commonly used as the name or description of a kind of goods. It cannot become a trademark under any circumstances.

\*　　\*　　\*　　\*　　\*　　\*

A merely descriptive term specifically describes a characteristic or ingredient of an article. It can, by acquiring a secondary meaning, i.e., becoming "distinctive of the applicant's goods" ..., become a valid trademark.

\*　　\*　　\*　　\*　　\*　　\*

A suggestive term suggests rather than describes an ingredient or characteristic

of the goods ... [and] can be protected without proof of a secondary meaning.

\*　　\*　　\*　　\*　　\*　　\*

An arbitrary or fanciful term enjoys the same full protection as a suggestive term ....[9]

■ In order to establish that a descriptive term is a trademark, a plaintiff must demonstrate that the term has acquired a secondary meaning. It has long been acknowledged that the phrase secondary meaning is a somewhat misleading one. E.g., G. & C. Merriam Co. v. Saalfield, 198 F. 369, 373 (6th Cir.1912), cert. denied, 243 U.S. 651, 37 S.Ct. 478, 61 L.Ed. 947 (1917) ("[T]his phrase, 'secondary meaning,' seems not happily chosen, because, in the limited field [of commerce in question], this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning.") Thus, to establish a secondary

---

9. This categorical summary has been repeated on many occasions. E.g., Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1183 (5th Cir.1980), cert. denied, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); The Money Store v. Harriscorp Finance, Inc., 689 F.2d 666 at 673 (7th Cir. 1982); Telemed Corp. v. Tel-Med, Inc., 588 F.2d 213, 216–17 (7th Cir.1978); Surgicenters of America, Inc. v. Medical Dental Surgeries, Co., 601 F.2d 1011, 1014–15 (9th Cir.1979).

This court was not the first court to so categorize terms for purposes of trademark analysis. While the descriptive nature of terms has long been considered relevant in trademark cases, see, e.g., Manufacturing Co. v. Trainer, 101 U.S. 51, 55, 25 L.Ed. 993 (1879), the specific four part categorization articulated in Miller was borrowed from Judge Friendly's opinion in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir.1976).

Both Miller and Abercrombie relied upon common law and statutory law in reaching the conclusion that a generic or common descriptive term cannot become a trademark under any circumstances. Our examination of those authorities, and others not considered by those courts, raises serious questions concerning that absolute statement. See generally Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) (holding generic term could become a "trade name" upon a proper showing of secondary meaning); Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 380 (7th Cir.), cert. denied, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) (stating that it is more difficult to establish secondary meaning for a generic term than a merely descriptive one); American Aloe Corp. v. Aloe Creme Lab-

oratories, Inc., 420 F.2d 1248, 1251–52 (7th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970) (holding generic term capable of becoming a trademark upon a strong showing of secondary meaning); Henry Heide, Inc. v. George Ziegler Co., 354 F.2d 574, 576 (7th Cir.1965) (holding that in some circumstances generic term incapable of becoming a trademark); Sen.Rept. No. 87–2107, 87th Cong., 2d Sess. (1967) (reprinted in 1967 U.S. Code Cong. & Admin.News 2844, 2851–52) (legislative history inconsistent with Abercrombie's interpretation of § 14(c) of the Lanham Act, 15 U.S.C. § 1064(c); Restatement of Torts, §§ 715–21, 735 (1938) (recognizing difference in nomenclature between technical trademarks and trade names prevailing at common law); 3 R. Callman, Unfair Competition, Trademarks and Monopolies § 74.4 (3d ed. Supp.1981) (criticizing Miller); Handler & Pickett, Trade-Marks and Trade Names—An Analysis and Synthesis, (Pts. I & II), 30 Col.L.Rev. 168, 759 (1930) (explaining the differences, real and illusory, between technical trademarks and trade names). It is unnecessary, however, for us to decide in this case whether or not Miller's absolute statement that a generic term can never become a trademark is a correct statement of the law. Here, we cannot say that the district court's characterization of the putative mark as merely descriptive is clearly erroneous, and it is clear that a merely descriptive term can become a trademark upon a proper showing of secondary meaning.

meaning for a term, a plaintiff "must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938).

The parties' reaction to the foregoing principles is representative of a decided tendency in trademark cases to argue about the legal labels rather than the underlying analytical inquiries those labels are designed to trigger. The labels themselves are merely springboards for analysis, not a substitute for it. The point is a basic one, but bears repeating, for it is all too often forgotten when the law is reduced to a few conclusory classifications: such abstract categories are analytical touchstones for a much more sophisticated inquiry. Moreover, the precise wording of the verbal summary is necessarily tied to the factual context which spawned the verbal formula, and thus will not be particularly salient in a myriad of factual settings.

█ The law recognizes the right of one individual to prevent another from labeling his product with a particular term in order to prevent the misrepresentation of the product's source. Such a misrepresentation harms both the purchaser and the individual who has been impersonated. The legal wrong to the purchaser is a paradigm of the tort of fraud. The wrong to the impersonated party is given legal life by recognizing in that party a right in his identity—a "property" right in his mark of identification, appurtenant to his property rights in the goods he so marks, enabling the "owner" of the trademark to enjoin the imposter from continuing misrepresentations. *See United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918).

It has long been acknowledged, however, that the property right characterization of a trademark is fraught with conceptual pitfalls: the danger always exists that courts may be granting one producer an unwarranted competitive advantage "based upon the notion that by advertising one can obtain some 'property' in a name. We are nearly sure to go astray in any phase of the whole subject, as soon as we lose sight of the underlying principle that the wrong involved is diverting trade from the first user by misleading customers who meant to deal with him." *S.C. Johnson & Son v. Johnson,* 116 F.2d 427, 429 (2d Cir.1940) (L. Hand, J.). *See also James Burrough, Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir.1976) ("A 'trademark' is not that which is infringed. What is infringed is the right of the public to be free of confusion and the synonymous right of a trademark owner to control his product's reputation."); *International Order of Job's Daughters v. Lindeburg and Co.,* 633 F.2d 912, 919 (9th Cir. 1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981) ("[T]he 'property right' or protection accorded a trademark owner can only be understood in the context of trademark law and its purposes. A trademark owner has a property right only insofar as is necessary to prevent consumer confusion as to who produced the goods and to facilitate differentiation of the trademark owner's goods.")

Properly understood, the so-called trademark spectrum reflects levels of judicial skepticism concerning whether the term actually serves the source denoting function which a mark is supposed to perform. Terms which are arbitrary, fanciful, or suggestive as applied to a given product or service are naturally understood by the consuming public as designations of origin: it is unlikely that such terms would be understood as anything else. Hence, the exclusive right to use such a term in connection with such a product or service vests in that individual who first used the term in a particular market. Descriptive terms, on the other hand, are ill-suited to serve as designations of origin, for such terms are naturally understood by the consuming public in their ordinary descriptive sense. In order to acquire the exclusive right to use such a term, the user must demonstrate, as a matter of empirical fact, that the paramount commercial significance of the term

in the minds of the consuming public is not its ordinary descriptive import, but rather, a declaration that the item so labeled originates at a single, albeit perhaps anonymous, source. Stated another way, a party attempting to appropriate the exclusive use of a descriptive term must persuade the court that the consuming public treats the term as a declaration that the item or service bearing the term originates at a single source, and thereby rebut the presumption that the public regards the term as merely describing an attribute of the item or service.

We begin our analysis of the facts of this case by taking judicial notice of the highly regulated industry in which these parties operate. The FCC has licensed both parties in this case, and in its regulations has expressed concerns over the very question at the heart of this litigation—the danger of radio listeners being confused regarding the source of public broadcasting.

Radio stations are required to broadcast an official station identification each hour they are on the air. 47 C.F.R. § 73.1201(a) (1981). In the official station identification, stations are required to use their call letters, but may also use their name or assigned frequency (or channel number), as stated in their licenses: "No other insertion is permissible." *Id.* § 73.1201(b). Subject to certain limitations, licensees "are eligible to request call signs of their choice if the combination is in good taste and is sufficiently dissimilar phonetically and rhythmically from existing call signs of stations in the same service area so that there will be no significant likelihood of public confusion." *Id.* § 73.3550(j). "Call signs are normally assigned on a 'first-come-first-served' basis." *Id.* § 73.3550(k).

These provisions, and their history, *see, e.g.,* 41 Fed.Reg. 7105 (Feb. 13, 1976), while they may not preclude recognition of FM 107 as a trademark, surely must counsel against it.[10] The FCC is sensitive to the

dangers inherent in confusing radio listeners regarding the source of broadcasts, and has attempted to ensure the listener's ability to differentiate among various stations by requiring stations to adopt a distinctive mark of identification—call letters—and to use that mark regularly on the air. It permits stations to use their frequency designation as stated in their licenses, *i.e.,* their precise frequency, in the required official station identification. Given our examination of FCC consideration of proposals to vary the content of official station identification, *see id.,* and the scrutiny which the FCC is exercising to ensure that confusion will not result, we doubt that a station would be permitted to use a rounded frequency number in its official station identification.

■ That conclusion does not end our inquiry, for official station identification requirements do not preclude a radio station from adopting another trademark, particularly for use in advertising the station in other media. Indeed, the Lanham Act's definition of a service mark expressly mentions radio. 15 U.S.C. § 1127.

We now turn to plaintiff's attempt to demonstrate that it has the exclusive right to use FM 107 as a designation of origin, noting that plaintiff bears the burden of proof regarding this unregistered mark, *e.g., Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 373 (1st Cir.1980); *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1370 (10th Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978); and noting that the district court's classification of the term on the trademark spectrum and its finding of secondary meaning may only be set aside if after considering all the evidence we are "left with the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *see, e.g., Inwood Laboratories, Inc.*

10. We note that WYEN points to six whole number frequency designations which were permitted to be federally registered in support of its case. The singular problem with WYEN

relying on those registrations, however, is the fact that each one of the numbers is preceded by an alphabetic prefix taken, we gather, from the station's call letters.

*v. Ives Laboratories, Inc.,* —— U.S. ——, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *The Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666 at 673 (1982); *Union Carbide Corp. v. Ever-Ready Inc., supra,* 531 F.2d at 381.

Plaintiff argues that FM 107 (or 107) when used in connection with its radio broadcasts is a merely descriptive term, while defendant maintains it is generic. Plaintiff seizes on the definition of a generic or common descriptive name enunciated in *Miller Brewing Co. v. G. Heileman Brewing Co., supra,* 561 F.2d at 79 ("one which is commonly used as the name or description of a kind of goods") and argues that FM 107 cannot be labeled generic because it is not the name of a "kind" of goods. Under plaintiff's literal interpretation of the generic end of the trademark spectrum, apparently only a term such as Music Radio could be considered the common descriptive name of a radio station. The short answer to that contention is that in applying the same methodology regarding the merely descriptive label, it would be awkward at best to regard FM 107 as an ingredient or characteristic of the programming plaintiff offers.

Plaintiff's error arises from reliance on definitions which were formulated in quite different factual settings. Attempting to apply the definitions enunciated in *Miller* to numerals is often a futile endeavor, for numerals "are meaningful only by virtue of the circumstances attending their use." 3 R. Callman, Unfair Competition, Trademarks, and Monopolies § 73.3 at 223 (3d ed. 1969). In some cases, admittedly, a numeral for which trademark protection is claimed is used to describe a characteristic of the article, *e.g.,* size and grade markings, and in such cases, they may not be exclusively appropriated by first use, *Coats v. Merrick Thread Co.,* 149 U.S. 562, 13 S.Ct. 966, 37 L.Ed. 847 (1893), but rather, only upon a showing of secondary meaning, *Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1022 (7th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

For purposes of determining where FM 107 fits on the trademark spectrum, the crucial inquiry centers around the ordinary meaning of the term. It seems undisputed that the term primarily denotes an approximate position on the radio dial. Moreover, it is undisputed that FM radio stations customarily round their precise frequency designations for the purpose of designating their location on the FM dial. Thus, one might conclude that FM 107 is the common name of a radio station which broadcasts at approximately 107 on the FM dial. Like other generic terms, one could reason, its primary meaning makes it applicable to several products—the radio programs of the various stations which broadcast in that area of the FM band. On the other hand, the term may be viewed as descriptive of the practical location of the broadcast service. The district court found the latter label more apt, and we cannot say that finding was clearly erroneous.

We reach this conclusion, however, recognizing that the reason for labeling terms on the trademark spectrum is to determine whether or not the exclusive use of the term should vest in the first user without requiring a showing that the term actually functions as a trademark in the marketplace. In this case, we believe that FM 107 is capable of becoming distinctive of a particular radio station, but it is surely not inherently distinctive given the utilitarian function it serves in relationship to the service to which it is applied. In short, the term may have become distinctive of plaintiff's radio station, the question in this case is whether it has acquired such a secondary meaning.

WYEN points to the following evidence to establish secondary meaning: (1) the fact that it was the only station in the area to use the term for over ten years; (2) four affidavits of members of the broadcast industry stating that they recognize 107 as a designation of origin of WYEN and no other Chicago radio station; (3) testimony and exhibits purportedly indicating that some radio listeners "identify" WYEN by the term 107; and (4) that it has spent approxi-

mately $1,000,000 in the advertising and promotion of 107 "as a designation of origin."

■ The fundamental failing in plaintiff's showings is that they essentially assume that which plaintiff must prove: that plaintiff's use of 107 is understood by the consuming public as a designation of origin and not in its utilitarian sense of calling the listener's attention to a location on the FM dial. An important consideration in a case such as this is whether WYEN emphasized the term FM 107 as a service mark or trade name, or rather used it in its utilitarian sense. *See G. Leblanc Corp. v. H & A Selmer, Inc.,* 310 F.2d 449, 455–56 (7th Cir. 1962), *cert. denied,* 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412 (1963); *cf. Homemakers Home and Health Care Services, Inc. v. Chicago Home for the Friendless,* 484 F.2d 625, 628 (7th Cir.1973). Of course, WYEN's subjective intent regarding this issue is of little moment; the initial question is how did it use the term. The evidence it proffers indicates that 107 was used in conjunction with its call letters in its promotions. By using the term in conjunction with a term which is clearly a designation of origin —indeed, an official one—it is unlikely that potential listeners would view the term 107 in anything but its utilitarian sense. *See Wilhartz v. Turco Products, Inc.,* 164 F.2d 731, 732–33 (7th Cir.1947); *cf. M.B.H. Enterprises, Inc. v. WOKY, Inc.,* 633 F.2d 50, 53–55 (7th Cir.1980).[11] In short, its *use* of the number was not "designed . . . to point to the ownership or origin of the broadcast service, but to facilitate listener access to that service by indicating the service's approximate frequency . . . ." *Covenant Ra-*

*dio Corp. v. Ten Eighty Corp.,* 35 Conn. Supp. 1, 390 A.2d 949 (1977). The facts that it used the term for ten years and spent large sums of money in advertisements containing the term are simply not germane unless it can show that the way in which it employed the term dispelled the tendency of listeners to regard the term as its approximate position on the FM dial and instead regard the primary significance of the term as designating a single, though perhaps anonymous, source of radio broadcasts.

The affidavits proffered by WYEN not only contain mere legal conclusions by individuals situated similarly to plaintiff, but are wide of the mark in any event. "In testing the validity of common law trademarks the critical question is what the designation meant to the purchasing public; not what the designation meant to those in the industry." *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., supra,* 561 F.2d at 1369.[12]

The sole evidence directed toward the "chief inquiry" of the listener's attitudes toward the mark, *Union Carbide Corp. v. Ever-Ready Inc., supra,* 531 F.2d at 380, consists of exhibits and testimony indicating that some of WYEN's listeners "identify" it as FM 107. The exhibits, however, are entirely unilluminating, consisting of letters to the station which use the term WGCI FM 107. This evidence suffers from the same defect as its evidence of advertising expenditures: the use of 107 in conjunction with its call letters is at least ambiguous, and at most suggests that the term is used in its ordinary sense. In addition, there is certain testimony concerning misdi-

---

11. We recognize that this case (not cited by the parties) does indicate that a whole number frequency designation is "plainly" a service mark. Compare 633 F.2d at 52 & 54. However, the frequency in the case was that of an *AM* station and the frequencies of such stations are distinctive, at least vis-a-vis other AM stations, there being no decimal points to complicate matters. Complications may arise, however, from the fact that AM stations may drop the last digit of their assigned frequency: *e.g.,* in *M.B.H. Enterprises, Inc.* itself, radio station WOKY, licensed to broadcast at 920 kilohertz, identified itself as Radio 92. Thus, if an FM

radio station in the same market were licensed to broadcast between 91 and 93 megahertz, and rounded to 92, the same basic problem as exists in the instant case would arise, particularly if the FM station used the term Radio 92 rather than FM 92.

12. Plaintiff's citation of *Ideal Industries, Inc. v. Gardner Bender, Inc., supra,* 612 F.2d at 1023, as support for giving weight to these affidavits is totally inapposite. In *Ideal,* the purchasers were those in the relevant industry, *i.e.,* contractors, wholesalers, etc.

rected phone calls, which just so happened to commence at the time WYEN learned its Arbitron ratings had plummeted. One of WYEN's disc jockeys, it seems, began to make notes of phone calls he received when he considered the caller to be requesting "a song that was completely out of context" for WYEN or when someone was calling him "to identify something that [he] had played which [he] could not identify," indicating to him that the public was confused between WYEN and WGCI. The disc jockey was "not sure," however, that the callers actually intended to call WGCI, but "could merely ascertain that the public was indeed confused." [13] Moreover, at least one of the callers asked for him by name, something the caller would hardly have done if the caller wanted to reach WGCI.

The basic failing of this evidence however is twofold. First, a few isolated instances of misdirected phone calls are far too slim a reed on which to base a conclusion that 107 has secondary meaning. Second, there was no testimony establishing that the confusion stemmed from WGCI's use of 107. The facts that listeners confuse various radio stations in an area, particularly ones close to each other on the FM dial, and fail to remember on which station they heard a particular song simply reflect the district court's finding that listeners do not pay close attention to such matters; it does not say anything about the public's understanding of the significance of the term FM 107. Before the instant controversy, it appears that the disc jockey was not quite as sensitive to or concerned with whether the songs requested by listeners were "completely out of context." Hence, we have no way of knowing whether the confusion inherent among radio listeners was significantly exacerbated by WGCI's use of the term FM 107 five times daily in its broadcasts.

The real evidence upon which plaintiff apparently must rely is the Arbitron diaries.

Those diaries are the worst possible place to find evidence of secondary meaning. The people who completed those diaries were told to carry the diaries with them and contemporaneously record the dial setting of the station they were listening to if they did not know its call letters: the respondents were asked to look at their radio and record the dial setting they saw. Such responses tell us nothing about the listeners' perception of the significance of 107 aside from reinforcing its utilitarian function of denoting an approximate location on the FM dial.

There is, in the final analysis, a basic difference between broadcasters and other producers which creates conceptual difficulties in applying trademark principles to their marks. In most trademark cases, the public is the purchaser of the trademark owner's product. The theory behind trademark law is that in the marketplace, consumers will select a particular product on the force of its mark. *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942). When one uses a confusingly similar mark, customers are essentially defrauded and do not get what they desired, and trade is diverted from the party with whom the purchaser meant to deal. In this case, however, in an economic sense, radio listeners are not the radio stations' customers, but rather, they (or their collective attention) are its product. The radio stations' customers are the advertisers who pay the stations to broadcast commercial messages to the listeners. The product in this case quite literally speaks for itself. The problem arises when the product does not know its origin, or mistakenly believes it originated with a given station, or ambiguously declares its origin.

Given the factual setting here, however, it would be economically suicidal for a radio station to pass itself off as one of its com-

---

**13.** The disc jockey, evidently aware that WGCI's programming was directed towards the black community, was particularly attuned to the possibility of confusion when he believed that a caller was black. The disc jockey thought he could identify the race of a caller based on his or her manner of speech. Requests from individuals whom he believed to be black were, it appears, more likely to be deemed "out of context."

petitors by use of a truly distinctive mark of its competitor. For example, it would be nonsensical for WGCI to identify itself on the air as WYEN for then Arbitron respondents, believing that they are listening to WYEN, would record that fact in their diaries. Conversely, from an economic perspective, it really makes no difference if anyone actually ever listens to a radio station named X, so long as people think they do and dutifully so report to Arbitron. As the district court observed, the listeners have no real incentive to exercise any great care in differentiating among the symbols of the various stations. In contrast, in the ordinary trademark paradigm, it is assumed that customers are discriminating among products on the basis of symbols and hence have an interest in remembering a symbol of a particular product that they have found deserving of their loyalty.[14]

The real issue in this case, as much as WYEN would like to avoid it, is the method by which Arbitron credits diary entries to a given station. Given the nature of the instructions given to Arbitron respondents, we do not believe that there can be any doubt that WYEN over the years has been credited with diary responses which should have been credited to WGCI. The district court implicitly recognized as much when it held that WGCI was not attempting to pass its product off as that of WYEN (as we have observed, this would be senseless) but rather was attempting to get credit for Arbitron diary entries. WGCI only used the term 107 five times a day, the minimum required in order to accomplish that result. The unstated linchpin of plaintiff's case is that respondents recorded 107 in their diaries because of WGCI's use of the term. That may have been true of a number of respondents, but given the few times a day WGCI used the term, and the fact that respondents were directed to record the dial setting of the radio setting in front of

them, we doubt it accounts for very many of the responses. It is WYEN which seeks to take credit for all 107 responses, knowing that at least a share of those respondents were actually listening to WGCI.[15] It attempts to accomplish this result by appropriation of a term which is not distinctive, a term which Arbitron respondents would apply to either WYEN or WGCI in their diaries irrespective of whether either station ever used the term.

Interestingly, WYEN informs us that since the injunction entered by the district court, WGCI has been identifying itself on the air as GCI 107. To the extent that Arbitron respondents record a number in their diaries on the basis of the number which they have heard announced on the station, it would seem that they would be just as likely to record 107 now as before. It is no answer to say that now they would be likely to record the call letters, for when WGCI was using FM 107 alone only five times a day, it was also, as required by law, announcing its call letters hourly. The positions taken by the parties in this case, and the Arbitron procedures themselves, seem to contemplate that listeners might find it easier to use a frequency number than remember the call letters. Thus, as things now stand, it would seem that WYEN has the best of both worlds, and it is hardly surprising that WYEN does not cross appeal from the district court's refusal to enjoin WGCI from using 107 in conjunction with a personal identifier. WYEN will be credited with all 107 responses, and WGCI, by using 107 at all, may increase the number of such responses. WGCI's use of the term in light of this fact, however, further suggests that few diary responses of 107 alone are actually caused by its broadcast use of the term, and reinforces our conclusion that given the methodology of the Arbitron survey, those individuals recording

14. It is therefore said: "The crucial question in a case involving 'secondary meaning' always is whether the public is moved in any degree to buy an article because of its source." *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir.1979), *cert. denied,*

445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

15. Moreover, WGCI's evidence concerning the demographics of the respective audiences of the two stations which WYEN does not refute, provides further support for this conclusion.

only 107 in their diaries do so on the basis of a visual inspection of their FM dial.

We do not mean to suggest from the foregoing analysis that FM 107 is incapable of exclusive appropriation by WYEN.[16] Rather, we suggest that the nature of the confusion pointed to by WYEN demonstrates that the primary significance of the term in the minds of the consuming public was not a particular radio station, but rather a position on the FM dial. The meager showing WYEN made regarding the public's perception of the term which it claims the right to exclude other radio stations in the 107 neighborhood from using was clearly insufficient to meet its burden of demonstrating secondary meaning. We do not quarrel with the district court's subsidiary factual findings, but are left with the definite and firm conviction that its penultimate finding of secondary meaning was a mistake.

### IV

Accordingly, the judgment of the district court is hereby reversed and this cause is remanded to the district court with instructions to vacate the injunction entered against defendant.

16. There are other factors in the trademark calculus, such as the reputation of the producer, that admit of trademark protection even under the circumstances here.