**COX COMMUNICATIONS, INC., Plaintiff,**

v.

**SUSQUEHANNA BROADCASTING CO., Defendant.**

**Civ. A. No. C85–2986A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 25, 1985.

R. Keegan Federal, Dow, Lohnes & Albertson, Atlanta, Ga., Arnold Lutzker, Car-

olyn Wimbly, Washington, D.C., for plaintiff.

Jill J. Pennington, Cohn & Marks, Washington, D.C., Michael R. Levinson, Chicago, Ill., Kirkland & Ellis, Chicago, Ill., James J. Thomas, Long & Aldridge, Atlanta, Ga., for defendant.

## ORDER OF THE COURT

FORRESTER, District Judge.

This case came on for hearing before the court on a motion for a preliminary injunction after the court had earlier declined to issue a temporary restraining order. For the reasons set out below the court must once again deny Cox the relief that it seeks.

■ In order to be entitled to a preliminary injunction plaintiff has the burden of establishing four elements: (1) that there is a substantial likelihood that it ultimately will prevail on the merits; (2) that it will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to plaintiff outweighs whatever damage the proposed injunction may cause defendant; and (4) that the public interest will not be harmed if the injunction should issue. *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir.1983). After consideration of the evidence adduced at the hearing, the court concludes that plaintiff has failed to carry its burden as to the first, second, and fourth elements and that the preliminary injunction should not issue.

## I. LIKELIHOOD OF SUCCESS ON THE MERITS.

The plaintiff has entered this court in the vehicle of law of unfair competition and trademarks. It came here, it is supposed, out of a general faith in the courts of this country to solve all problems and right all wrongs. It appears, however, that Cox's main problem is not with its adversary but with a market research firm named Arbitron. Twice a year Arbitron publishes a book which purports to tell broadcasters and advertisers alike who, in this metropolitan area, is listening to what radio stations.

The information conveyed is put in terms of market shares as a function of sex, age, time of day, day of the week, and location of the radio. The equity that Cox is entitled to under ordinary norms of fair play is to have Arbitron report with the greatest precision possible on the market shares of its Atlanta station, WSB–FM. Cox fears that there are conditions in the local market which may, because of Arbitron's historic procedures, cause an under-reporting of the market share attributed to WSB, and may result in an over-stating of the market share of Susquehanna's local FM station, WRMM. If this occurs it seems to the court that in terms of everyday, common sense fairness, Cox is being harmed by Arbitron's publishing of inaccurate data (if it turns out to be inaccurate). As Cox apparently has not been able to think of a common law writ which would protect it against inaccuracies by Arbitron, it comes here asking that Susquehanna be restrained from practices which Cox contends are creating a market measurement difficulty for Arbitron. Said another way, Cox is almost exclusively concerned with what Arbitron will report in a few months about the listening habits of Atlantans during the spring of 1985 and is very little concerned that its good will with its listeners is being devalued or that its customers are being misled into accepting the services of another on the belief that it is a service provided by WSB.

Hereafter the court sets out the facts which were established at the hearing and which seem pertinent to trademark analysis. In 1981 and immediately before, WSB–FM was considered a "beautiful music" station. Its programming consisted of the kind of music which, according to witnesses, is most often associated with elevators. It called itself "Beautiful FM 98."

In 1981 new management came in and sought to boost the station's market share. After some expenditure of funds the next ratings indicated that the market share declined, and so it was concluded that the programming should be changed. A programming consultant was hired and on her

suggestion a new program director and new disc jockeys were hired and a whole new music list was selected. In an effort to disassociate itself with its old image the station dropped its call letters, WSB, from most of its station identification breaks and decided to abandon the number 98 as an identifier for the same reason. The station is assigned a frequency at 98.5. It considered using 97 as a part of its new identification but dismissed the idea when it was observed that that number was too distant from its assigned frequency. Instead, it settled on the next highest whole number, 99.

On March 15, 1982 Cox hosted a large reception for the advertising community and introduced "The New 99 FM." Thereafter, for a period of years the station promoted itself only as 99 FM. It spent sums approaching a million dollars to promote itself on billboards and in television commercials using only the term 99 FM, and it used this identifier until about a year ago.

Those persons familiar either with the history of radio or with the development and growth of Atlanta will recognize that WSB was for generations a pioneer in the field of radio and a leading citizen of Atlanta. The station's new management apparently first decided that, whatever good will those call letters once held, they now were a liability and so, as noted above, they were abandoned. In 1984 they re-thought the matter and decided that the initials for the "old gray lady of Peachtree Street" might after all carry a little good will, and so for the past year the station has been known in all of its promotions as "WSB 99 FM."

During the early 1980's Susquehanna operated a station in this market with the call letters WLTA and an assigned frequency of 99.7. The station had for several years located itself for listeners on the dial by promoting itself as "100 FM." The Federal Communications Commission requires that each station either once or twice an hour identify itself by its call letters and its exact frequency, and so listeners to that station would hear both 99.7 and 100, just as WSB listeners would hear 98.5 and 99. The geographic descriptions of 99 and 100 did not cause any appreciable problems for listeners trying to find these stations as long as radio dials were not precisely calibrated, and as long as the best one could do in tuning in a favorite station was to approximate its position on the dial. In this area, however, as in virtually every other, technology did not allow for complacency. Electronics manufacturers produced and began to market radios with precise digital dialing so that finding one's favorite station required the knowledge of the station's exact frequency. In response to this development, Susquehanna's Atlanta station, whose call letters had been changed to WRMM, began to identify itself regularly on its own promotions as 99.7, and in its billboard and other advertising the number 99.7 was prominently displayed.

Arbitron computes its market shares from diaries maintained by a random sample of listeners in the Atlanta area. There are two rating periods, one in the fall and one in the spring. Diary keepers are instructed to identify the station they are listening to either by call numbers, frequency response, or the name of the program. Additionally, if a broadcaster has a registered slogan such as "soft hits," entries made identifying the station by its slogan will be attributed to that station. After WRMM began using its exact frequency, understandably, some listeners began to associate the number 99 with that station instead of WSB. For at least two years Susquehanna had been concerned about the fact that WSB was receiving credit for virtually all of the diary entries showing only 99. It sought advice from Arbitron and learned that unless it identified itself over the air as "99" or "99 FM," it would not be entitled to any credit for diary entries identified only as 99 or 99 FM. Susquehanna inquired about phrases such as "Warm Between 99 and 100" but was told that such phrases were not sufficiently specific for WRMM to get credit for the "99" or "99 FM" entries. As the company felt that it was entitled to some share of the "99" entries, it began on April 26, 1985

to identify itself twice an hour as "WARM 99 FM." This is the minimum usage that the station could make of the 99 FM term and obtain entitlement to a share of the diary keepers who identified the station to which they were listening only by the number.[1] Otherwise, Susquehanna has done nothing to promote the station as 99 FM and continues its promotion of the station's frequency as 99.7.

As it seems evident that the numerical identifiers are not at all fanciful but instead are in the first instance indications of location on a radio dial (like geographical identifiers), Cox undertook to introduce evidence that 99 or 99 FM had acquired secondary meaning. First, as noted above, it proved that it had spent a little under one million dollars promoting itself only as 99 FM (in the last year it has spent half a million dollars promoting itself as WSB FM 99). In response to the digital radio phenomena WSB radio now also promotes itself to some extent by reference to its exact frequency, 98.5 megahertz. It seems to the court quite well established that a fair number of the citizens of this area associate WSB with the number 99.

A review of a sample of the diary entries for the fall of 1984 rating period indicates that in fifteen percent of the entries credited to WSB the diary keeper associated the call letters WSB with the frequency 99. On that same computation, ten percent of the diary keepers who made entries utilizing the call letters of WRMM or its homonym WARM or its slogan "soft rock" associated it with 99 or 99.7, or else they remembered only its exact frequency. At

Cox's behest, a marketing research group here in Atlanta made 500 random calls in the area during the first of May asking for an association of a radio station with the numeral "99." Twenty-one percent associated the number with WSB, while 8.6% associated the number with WRMM. Fourteen percent gave the response "99 FM." That group was tested in an effort to learn whether on prompting they could select a station. If that fourteen percent is allocated based on the result of the call back sampling, WSB's association with the number "99" would be 27%, whereas WRMM's association level would be ten percent. As noted previously, Arbitron has begun to call back diary keepers who referred to their stations only by the numeral. To date, the results of the call back procedure show that 61% intended to identify WSB and 30% meant to identify WRMM.

In order to prevail on its trademark claim plaintiff must first establish that it has protectible rights in the number "99." As noted above, the number "99" in this context is not fanciful or arbitrary but is instead descriptive of an approximate location on the FM dial. See Walt-West Enterprises, Inc. v. Gannett Co., Inc., 695 F.2d 1050 (7th Cir.1982); Covenant Radio Corp. v. Ten Eighty Corp., 35 Conn.Supp. 1, 390 A.2d 949 (1977). In order for a descriptive term to be entitled to trademark protection it must have acquired a secondary meaning. Walt-West Enterprises, supra, at 1056. The United States Supreme Court in Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938), stated that for a descriptive term to have

1. Where two or more stations employ the same identifier and a diary keeper identifies the station to which he or she is listening only by that identifier, then it is more difficult for Arbitron to determine which station the diary keeper intended to identify. Arbitron has developed a process by which it "ascribes" such entries among the stations employing that identifier according to the relative market shares of the stations in the previous survey. It is this ascription which so much concerns Cox. As it is no doubt true that the vast majority of the diary entries using only the numeral 99 or 99 FM refer to WSB, the ascription will cause a shift to Susquehanna which might amount to as much

as seven- to eight-tenths of a percent share. No direct evidence was introduced on the economic value of a one percent market share, but the court understands that it is generally substantial. The converse of the problem is that somewhere between ten percent and thirty percent of the people in the market think of WRMM in terms of 99 and if no ascription is made then Susquehanna's market share will be understated. Arbitron is presently using a call back procedure in an effort to make its ascription more accurately reflect listening habits. The court is encouraged to believe that if the call back procedure is continued no great injustice will be done to either of the parties.

secondary meaning the "primary significance of the term in the minds of the consuming public" must be the producer and not the product. The preponderance of the evidence here shows that what the listener is responding to is the product rather than the producer. To demonstrate producer allegiance in a broadcasting case would require a showing that the listener has come to select the station because over a period of time the listener has come to like that station's artistic taste and journalistic style, reliability, and content and has chosen to listen to that station on the basis of opinions formed after a period of evaluation. Here, there is every reason to believe that instead of seeking out WSB as a venerated provider of agreeable programming, the listeners are making new judgments constantly based on the degree of pleasure the listener is obtaining from the product or service at the moment. This conclusion follows from two facts observed in the Arbitron reports for the past few years. When WSB changed its programming material from "beautiful music" to "soft hits," which euphemistically describes generic soft rock, the demographics of its audience changed as well as its market share. The share increased and the listening audience became much younger. In the fall of 1984 the program director at WSB made a decision to include "oldies" in the music being broadcast. During that survey period the market share dropped to 3.5, down 1.3 points from the spring of 1984 rating period, and 2.4% from its ratings high water mark achieved in the fall of 1982. From the demographic shift observed with the first format change, the court concludes that to a large measure a different group of people is now listening to WSB than when it was a "beautiful music" station, and with the decline in market share based on the second format change, the court concludes that these new listeners by and large are not attracted to the institution that is providing the service but instead are very sensitive to the content of the service itself.

The second element which Cox must show to prevail on its trademark claim is confusion in the market place as to the source of the service.

In this circuit likelihood of confusion is determined by evaluating a variety of factors including the type of trademark at issue; similarity of design; similarity of product; identity of retail outlets and purchasers; identity of advertising media utilized; defendant's intent; and actual confusion.

*Roto-Rooter Corporation v. O'Neal,* 513 F.2d 44, 45 (5th Cir.1975), citing *Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857 (5th Cir.1967); *see also Safeway Stores, Inc. v. Safeway Discount Drugs,* 675 F.2d 1160, 1164 (11th Cir.1982); *Sun Banks of Florida v. Sun Federal Savings & Loan Association,* 651 F.2d 311, 314 (5th Cir.1981). To state the test at all is to prove the difficulty of applying trademark concepts to the facts of this case. This is not a case where one party is palming off his products as those of a better known competitor in order to trade on the competitor's good will. Neither plaintiff nor defendant markets a product which is purchased, in any ordinary sense of the word, in reliance upon a belief that the product comes from a particular producer. The "product" in this case is radio programming, and that product is freely distributed to any who choose to listen. Plaintiff does not contend that any significant number of listeners of WRMM choose that station out of a mistaken belief, caused by the use of the term "WARM 99 FM," that they are listening to WSB. Thus, traditional trademark concepts, which were developed to prevent "palming off" of one's goods as those of a competitor, seem to have little applicability.

To the extent that there is any actual confusion in the market place, the court concludes that the greatest source of such confusion is caused not by any similarity of trademarks but rather by the fact that both stations have nearly identical formats and play the same kind of music. Such confusion as this may create is further aggravated by the fact that the stations are in close physical proximity to each other on the FM

dial and there is no station in between them. None of the confusion from these sources is caused by anything that Susquehanna has done. As is typical with most FM stations, the announcers intrude only briefly on the musical format, and the station promotions are not given so often as they are on a typical AM station. If a listener really cares about which of the two stations he is listening to, it is difficult to believe that his confusion will last past the first station break. WSB for more than one year has always identified itself with its call letters by statements such as the one currently posted in the announcing booth, which is, "You're listening to WSB FM Atlanta. WSB 99 FM, 98.5 on a digital radio," or, "WSB—99 FM .. on a digital radio we are 98.5." On the other hand, WRMM identifies itself by its call letters, WRMM, or by the homonym WARM, and these are used most often in conjunction with its exact frequency location, 99.7. Even when the contested 99 FM is used, it is used in connection with WARM. Beyond a minimal amount of confusion which is as much aborne of total inattention and disinterest as it is of anything that Susquehanna is doing, Cox was unable at the hearing to produce anything more than speculation that there would be confusion with listeners.

It seems to the court in the final analysis that a certain confusion is inevitable and is not the result of the use by Susquehanna of the nomenclature "99 FM." Its address on the radio dial is 99.7. It must identify itself in that fashion and it has a total right to its own address. By choosing to use the most easily remembered portion of a sister station's address, Cox and not Susquehanna has created this opportunity for confusion. The court understands that it was not unusual in the past for a station to round up or down to the nearest whole number and therefore means no criticism of WSB's decision to use 99. What the court does mean to say is that any confusion that exists is in the first instance and the most immediate sense caused by that decision to use a numeral which another station is, in fairness, entitled to use.

Finally, even if plaintiff could establish that the number "99" has acquired a secondary meaning and that defendant's use of the number created a likelihood of confusion, the court would nevertheless conclude that defendant is entitled to assert a "fair use" defense. As noted above, the number "99" describes an approximate address on the FM dial. WRMM has at least as much right to locate itself for its listeners by means of this address as WSB has. Even if plaintiff has acquired protectible rights in the number "99," it cannot exclude WRMM from fairly and truthfully using the number to describe its location. *Manufacturing Co. v. Trainer*, 11 Otto 51, 101 U.S. 51, 54–55, 25 L.Ed. 993 (1879); *cf.* 15 USC § 1115(b)(4) (codifying common law).

■ Because the court concludes that plaintiff has failed to show secondary meaning or a likelihood of confusion as a result of defendant's use of the term "WARM 99 FM," and because the court concludes that defendant is entitled to assert a valid "fair use" defense, the court concludes that there is not a substantial likelihood that plaintiff will prevail on the merits. A preliminary injunction would, therefore, not be proper.

## II. IRREPARABLE INJURY.

The court also concludes that plaintiff has failed to show that it will be irreparably injured if an injunction does not issue. As noted above, Arbitron's call-back procedure is substantially curing any distortion of the survey results caused by rote application of its ascription process. To the extent that the call-backs do not cure the problem, the court believes that any irreparable injury would be caused not by defendant but rather by Arbitron publishing as accurate survey results it has reason to believe are distorted.

## III. PUBLIC INTEREST.

Finally, the court believes that enjoining defendant's use of the number 99 would be strongly adverse to the public interest.

FM radio stations are assigned by the FCC a frequency somewhere between 88.1 and 107.9 Megahertz. 47 CFR § 73.201 (1981). Because of the manner in which frequencies are assigned, no station is assigned a whole number. *Walt-West Enterprises, Inc. v. Gannett Co., Inc.*, 695 F.2d 1050, 1052, n. 1 (7th Cir.1982). However, for a variety of reasons stations have found it to be commercially advantageous to round up or down to a whole number. There are only twenty-one possible whole numbers on the FM spectrum (88–108), and in some congested markets there are several stations who could logically round up or down to the same whole number.[2] It would be absolutely unconscionable to allow one station to appropriate for itself and exclude all others from using a whole number which truthfully describes an approximate geographical location on the FM dial. To allow that would be to give that station an unfair competitive advantage. Trademark law protects competitive advantages which are fairly acquired. It does not, however, allow one radio station to prevent another from locating itself for potential listeners.

## IV. CONCLUSION.

In sum, the court concludes that plaintiff has failed to carry its burden of showing that there is a substantial likelihood it will ultimately prevail on the merits, that it will suffer irreparable injury, or that an injunction would not be adverse to the public interest. The court concludes, therefore, that plaintiff's motion for a preliminary injunction must be DENIED.

**2.** At the hearing defendant demonstrated on a portable radio that stations located at 98.5, 99.1, and 99.7 MHz could all be heard in Atlanta. It is theoretically possible, although unlikely, that other stations with frequencies of 98.7, 98.9, 99.3, or 99.5 could be licensed to broadcast into the Atlanta area.